IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| RUTH A. BATTON ) | Case No. 04-40665-13-drd |
| ) | |
| Debtor. ) | |
| ) | |

MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion of Edna M. Bennett, settlor, beneficiary and acting trustee of the Edna M. Bennett Trust ("Bennett" or "Movant") to annul the automatic stay and validate a foreclosure sale held fifteen minutes after the filing of this Chapter 13 proceeding by the debtor Ruth A. Batton ("Debtor"). The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and (b). This is a core proceeding which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(G). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rules 9014(c) and 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the Court sustains the motion to annul the automatic stay and ratify the foreclosure sale.

I. FACTUAL AND PROCEDURAL BACKGROUND

Debtor purchased the real property which is the subject of this motion in 1995 from Bennett for $38,000. In partial satisfaction of that obligation, she executed a promissory note for $32,000 secured by a Deed of Trust on the property,[1] which was later assigned to the trust of which Bennett is the trustee.[2] Debtor failed to make the payment due in July, 2002 and subsequent

---

[1]Movant's Ex. 1.

[2]Movant's Ex. 3.

payments and in March, 2003 was declared in default. A foreclosure sale was scheduled for May 13, 2003, which was subsequently canceled as a result of the filing by Debtor of her first Chapter 13 proceeding on May 9. At that time, Debtor was 10 months behind in her payments on the note secured by her residence. In her Schedules of Assets and Liabilities, she listed the property and assessed its value at $40,000. In her Chapter 13 plan, debtor proposed to cure the arrearages on the note, paying them through her Chapter 13 plan, and maintain the ongoing monthly payments, those to be paid directly to Bennett outside of the plan. At the time of the filing, Debtor was not employed and had no regular income. She proposed to make the required Chapter 13 plan payments from "family contributions." No payments were made by Debtor to the Chapter 13 trustee pursuant to the plan and none of the required direct payments was made to Bennett. On motion of the Chapter 13 trustee for failure to commence making plan payments, the case was dismissed.

A second attempt at foreclosure was scheduled to occur on October 14, 2003. The sale was again canceled as a result of the filing by Debtor on October 7 of her second Chapter 13 proceeding, this time filed pro se. Rather than prepare new documents, Debtor simply filed, after deleting the name of the attorney previously involved, the same plan, Schedules of Assets and Liabilities, Statement of Financial Affairs and other documents used in her first Chapter 13 proceeding. By this time, Debtor was 15 months behind in payments on the note held by Bennett. While the Debtor made some payments under the plan filed in this second case (three payments of $250 each), no money was received by Bennett because the Chapter 13 plan was never confirmed. None of the direct payments the plan required to be made to Bennett on the ongoing monthly mortgage payments was made either. Debtor's case was dismissed again, this time on the motion of the Missouri Department of Revenue for failure to file required tax returns, produce copies of

such returns, if filed, or supply an affidavit demonstrating that Debtor was not required to file such returns.

Another foreclosure sale was set for February 10, 2004 at 2:00 p.m. Fifteen minutes before the scheduled time of the sale, Debtor filed her third Chapter 13 proceeding, also pro se. She made no effort, however, to notify Bennett or her counsel of the filing, nor did she record a copy of the petition in the county real estate records. The amount owed on the note secured by the property at the time of the sale was $31,450.90. The initial bid at the sale, made by Bennett, was $31,450.00. Another bidder, HG Equities L.L.C., bid $31,451.00 and became the owner of the property. The purchase price was paid and a trustee's deed was executed and delivered to the buyer, which it recorded on February 12, 2004.[3] Not until Bennett received notice by mail of the bankruptcy filing, did she become aware that Debtor had once again resorted to seeking relief under the Bankruptcy Code. HG Equities had no knowledge of the filing at the time of the sale. Both Bennett and a representative of HG Equities testified that there was and is no relationship or affiliation between HG Equities and Bennett or the trust which held the note.

As she had done with her second filing, in this her third filing, Debtor used the same documents that she had filed with the bankruptcy court in her first case in March, 2003.[4] Debtor is still unemployed and has no regular income. In her filings, she proposes to cure the arrearage on the note held by Bennett, with those payments to be made by the Chapter 13 trustee from the plan payment of $250 per month, and maintain the current monthly mortgage payments by direct payment, listing "family contributions" as the source of funds for her monthly expenses and plan

---

[3] Movant's Ex. 4.

[4] In her third filing, the Debtor did make a handwritten notation of the case number for her second proceeding (but not her first) and changed the figure for priority taxes due on Schedule E.

3

payments. Despite what her filings say, Debtor's proposal in response to the motion to annul the stay is to purchase the property from HG Equities or satisfy the full balance on Bennett's note. The source of funds for this payment is Debtor's brother, James Smith, and another individual named Timothy Chandler, who is described as an investor in "affidavits" filed with Debtor's response to the motion.[5]

Movant contends that the Court should grant its motion to annul the stay and validate the post-petition foreclosure sale for two reasons. First, Movant argues that Debtor has acted in bad faith, which constitutes cause for entry of an order granting relief from stay and that the other factors cited by courts as grounds for granting such relief are present in the case. Second, Movant argues that the sale is not avoidable pursuant to § 549(c), because HG Equities is a bona fide purchaser without knowledge of the filing and acquired the property for present fair equivalent value recording its deed while Debtor failed to record the petition or any notice thereof. Debtor maintains that she failed to make payments in the prior two cases because she was disabled and unable to work from injuries sustained in two separate automobile accidents. She claims further that the circumstances have now changed, since she proposes not to cure the arrearage and maintain the payments, but to buy the property from the purchaser or pay the entire balance of the loan using funds committed by her brother and his investor. She contends finally that the value of the property is $98,000, that she therefore has equity in the property and that it is necessary to an effective reorganization.

## II. DISCUSSION AND ANALYSIS

---

[5]The "affidavits" are unnotarized conclusory statements attached to Debtor's response to the motion alleging generally that each affiant is prepared to "cure the entire balance due to the holder of the note" within 48 hours.

A.  The Automatic Stay And Its Effect

The automatic stay comes into effect on the filing of a petition and prohibits certain actions, regardless of whether the parties taking them are aware that the filing has been made.  *In re Vierkant*, 240 B.R. 317, 320 (B.A.P. 8th Cir. 1999).  Among other things, it operates as a stay of any act to enforce a lien against property of the estate.  11 U.S.C. § 362(a)(4).  Without question, the conduct of the post-petition foreclosure sale in this case was a violation of the automatic stay.  There is a difference of opinion on the question of whether actions taken in violation of the automatic stay are void or merely voidable.  The Eighth Circuit has not ruled on the question, having expressly declined to do so in *Riley v. United States*, 118 F.3d 1220, 1222, n. 1 (8th Cir. 1997), *cert. denied*, 523 U.S. 1020 (1998).  In *Vierkant*, the Bankruptcy Appellate Panel took the position that acts taken in violation of the automatic stay are void and of no effect.  *Vierkant,* 240 B.R. at 325.  The current judges in this district, however, have taken different views, Judge Federman holding along with the Bankruptcy Appellate Panel that such actions are void, *In re EBG Health Care II, Inc.*, 303 B.R. 626, 630 (Bankr. W.D. Mo. 2003); *In re Smith*, 245 B.R. 622 (Bankr. W.D. Mo. 2000), with Judge Venters having taken the position that such actions are voidable.  *In re Williams*, 257 B.R. 297, 301 (Bankr. W.D. Mo. 2001); *In re Lett*, 238 B.R. 167, 193-96 (Bankr. W.D. Mo. 1999).  This Court concludes that it need not weigh in on either side of this dispute in this case, as even those courts holding that actions taken in violation of the automatic stay are void recognize that that rule is subject to certain equitable exceptions, including at least one of the grounds urged by movant here.  *In re Major*, 218 B.R. 501, 503 (Bankr. W.D. Mo. 1998); *See In re Adams*, 215 B.R. 194, 195-96 (Bankr. W.D. Mo. 1997). Specifically, § 362(d) authorizes the court, in appropriate limited circumstances, to annul the automatic stay, the effect of which is to grant retroactive relief and validate an action taken which might otherwise be

of no effect. *Adams,* 215 B.R. at 196; *Major*, 218 B.R. at 503; *see, Smith*, 245 B.R. at 623; *see also, Eastern Refractories Co., Inc. v. Forty-Eight Insulations, Inc.*, 157 F.3d 169, 172 (2d. Cir. 1998) ("an order 'annulling' a stay does have retroactive effect, and thereby reaches back in time to validate proceedings or actions that would otherwise be deemed void *ab initio*.").

B. Annulment Of The Stay

In *Williams*, a case remarkably similar to this one, Judge Venters identified the factors a court should consider in determining whether to grant a request to annul the stay and validate a post-petition foreclosure sale. They are: (1) whether the creditor had actual or constructive knowledge of the bankruptcy filing and, therefore, of the stay; (2) whether the debtor has acted in bad faith; (3) whether there is equity in the property of the estate; (4) whether the property is necessary for an effective reorganization; (5) whether grounds for relief from stay exist and a motion, if filed, would have been granted prior to the violation; (6) whether failure to grant retroactive relief would cause unnecessary expense to the creditor; (7) whether the creditor has detrimentally changed its position on the basis of the action taken; (8) whether the creditor took some affirmative action post-petition to bring about the violation of the stay; and (9) whether the creditor promptly seeks a retroactive lifting of the stay and approval of the action taken. *Williams*, 257 B.R. at 301. *See also Lett*, 238 B.R. at 195-96.

1. Movant's Lack Of Knowledge Of The Filing

There is no dispute that Bennett had neither notice nor knowledge of the filing of this case at the time the sale was conducted. Debtor admits she did not record the petition, or any notice thereof, in the real estate records. She also admitted she made no effort to advise Bennett or her counsel of the filing either before or after the sale. There is no evidence that either had knowledge or notice of the sale from any other source. The uncontroverted evidence is to the effect that

6

Bennett learned of the filing by receiving the notice sent by mail to Debtor's creditors by the Bankruptcy Noticing Center.

### 2. Debtor's Lack Of Good Faith

Debtor's conduct, both in this case and her prior two Chapter 13 filings, evidences in many ways a lack of good faith. Each of Debtor's prior cases was filed on the eve of a foreclosure sale and for the specific purpose of preventing those sales and frustrating Bennett's attempt to enforce the defaulted note. In each case, no payments were made to Bennett either from Debtor or from the Chapter 13 trustee. In one of those cases, Debtor failed to make any payments to the trustee. Each case was dismissed, one as a result of Debtor's failure to even commence making payments under the plan, a violation of 11 U.S.C. § 1326(a)(1), the other because of Debtor's failure to provide evidence of filing of tax returns to the Missouri state taxing authority.

Debtor argues she should not be held accountable for her failure to make payments in her prior bankruptcy cases being unable to do so because of her medical condition which prevented her from working. While Debtor's disability is an extenuating circumstance and was beyond her control, it also rendered her without income and thus not a candidate for Chapter 13, which requires, as a condition of eligibility, that the debtor have regular income. *See* 11 U.S.C. §§ 109(e), 101(30). Debtor knew this at the time she filed each of her previous Chapter 13 cases. In each case, she filed a plan she knew she had no reasonable chance of completing. Her reliance on "family contributions" was ill-founded, as her lack of payments in each case clearly demonstrated.

Debtor has also failed to act in good faith toward Bennett. Despite her knowledge of the impending foreclosure sale, which her filing was specifically designed to forestall, she took no action to give notice to other involved parties of either her intention to file or the actual filing of

the petition. Debtor did not even have the courtesy to notify Bennett or her counsel after her filing, leaving it to the Bankruptcy Noticing Center to provide notice to them in due course of mail.[6]

Debtor has made no payments on the loan secured by the property subject to the foreclosure sale since June, 2002, 22 months ago. No payments were made to Bennett in either prior Chapter 13 proceeding. In addition, Debtor has missed other opportunities to make payment on the loan from funds made available to her. She received a refund of $650 from the Chapter 13 trustee after the dismissal of her second bankruptcy case, but paid no portion of that to Bennett. In addition, she testified that between the dismissal of her first Chapter 13 proceeding and the filing of the second one, she received a settlement of her claim for injuries arising out of one of the automobile accidents in the amount of $3,700, but paid none of that to Bennett.

Bennett had also been requesting evidence of insurance on the residence, most recently through a letter by her counsel to Debtor dated October 16, 2003.[7] Debtor made no response to the letter, but testified at the hearing that she had placed insurance on the property, the effective date of which was February 10, 2004, the date of the scheduled foreclosure sale. She produced a copy of the policy,[8] which she claims to have supplied to the Chapter 13 trustee, although the trustee's representative at the hearing advised the Court that the trustee's office has no record of having received it.

Debtor has also acted in an extremely cavalier fashion regarding her obligation to file

---

[6]Such conduct, if engaged in by counsel for a debtor, would be sanctionable. *See In re Fulmer-Vaught*, 218 B.R. 56, 58 (Bankr. W.D. Mo. 1998) (debtor's failure to notify creditor of bankruptcy filing prior to foreclosure sale by "most expeditious means of communication available" may result in sanctions).

[7]Movant's Ex. 5.

[8]Debtor's Ex. 3.

8

accurate Schedules of Assets and Liabilities, Statements of Financial Affairs and other pleadings in this and her other bankruptcy cases. In each case, she filed the same pleadings containing the same information, despite the fact that, as a result of change in circumstances, the second and third filings were inaccurate in material ways. For example, in all but the first proceeding, the scheduled amount of Bennett's claim was incorrect as well as was Debtor's answer to question 5 on the Statement of Financial Affairs regarding the status of Bennett's efforts to foreclose her lien on the real property. On Schedule B, Debtor lists a personal injury lawsuit as an asset although, as of the date of her second filing, according to her testimony, that lawsuit had been settled and Debtor had received and expended the proceeds. Her filings contained no information about the settlement or the use of the proceeds. Debtor testified that money was used in substantial part, to pay claims for unpaid utility services. As counsel for Bennett pointed out, however, because Debtor had not changed her schedules, those claims, which would have been paid in whole or in part from the settlement proceeds, continue to be listed on Debtor's Schedule F as outstanding unsecured nonpriority claims. Among other things, a petition requires that a debtor disclose any prior bankruptcy cases filed within the previous six years. In her third filing, the Debtor included a handwritten notation with a reference to her second filing, but her first filing is not disclosed.

     Each time she filed, Debtor listed the value of her real property as being $40,000. At the hearing, she testified that she now believes her property to be worth $98,000 and explained the discrepancy by saying that she had since performed certain research. Debtor clearly knew, however, prior to her third filing that her property was likely worth considerably more than the scheduled amount. Before that date, she had received a tax bill from the county for the year 2003

indicating the assessed value of the property to be $53,275.[9] In addition, she was, during the weeks and months prior to the third filing, arranging insurance coverage on the property in the amount of $70,000. Debtor thus had information indicating a value for the property substantially higher than $40,000 and, according to her testimony at the hearing, clearly believed the property to be worth in excess of that amount. Despite that, she did not change the previous schedules and continued to list the property as having a value of $40,000. Obviously, in any bankruptcy proceeding, the value of a substantial asset is a material matter.

Finally, Debtor's proposed Chapter 13 plan in this case said what it has said in each of her prior filings – that Debtor intended to cure the delinquency on Bennett's claim and continue to pay the ongoing mortgage payments outside of the plan. Debtor's filed Chapter 13 plan specified that treatment of Bennett's claim despite the fact that Debtor's actual proposal for the treatment of the claim, as revealed in her response to the motion and her testimony at the hearing, is to purchase the property or the claim using funds provided by her brother and a third party.

In short, the Debtor has made little or no effort to make complete and accurate filings in this or her other Chapter 13 cases. The Bankruptcy Code and Rules require that the information supplied with the filings be true and correct. Debtors sign declarations under penalty of perjury to that effect. The integrity of the system depends upon adherence to those principles. *Cf. In re Bren*, 303 B.R. 610, 614-16 (B.A.P. 8th Cir. 2003) (to allow debtor to ignore seriousness of oath, submit documents to court that contain numerous material inaccuracies and excuse the behavior because debtor failed to read documents would undermine whole structure of system; debtors denied discharge); *see In re Eatman*, 182 B.R. 386, 392-93 (Bankr. S.D.N.Y. 1995) ("petition and

---

[9]Debtor's Ex. 1.

schedules riddled with material misstatements, inconsistencies and omissions"; thus, filed in bad faith and cause to lift stay existed); *see also, In re McMartin Indus., Inc.*, 62 B.R. 718 (Bankr. D. Neb. 1986) (failure to list accounts on schedules showed sufficient disregard for law and rights of secured creditor to be considered "cause" under § 362(d)(1)). Debtor has blatantly disregarded them.

### 3. Equity In The Property

Although there is a wide range of values suggested by the evidence, the choice of any one of them leads to the conclusion that there is equity in the property, a factor which does weigh against the granting of the requested annulment of the stay. Debtor testified that her residence is worth $98,000, although there is little basis for that contention.[10] A representative of HG Equities, the purchaser of the property, testified that the company estimates the fair market value of the property to be between $65,000 and $70,000. A tax bill introduced into evidence by Debtor shows the appraised value of the property to be $53,257. Debtor scheduled the property with a value of $40,000. At any of these levels, there is equity in the property to cover a debt of $31,451.90 at the time of the sale.

### 4. Necessity Of Property To An Effective Reorganization

Debtor unquestionably needs a place to live. It does not necessarily follow that this property is necessary to an effective reorganization. The fact that Debtor might need the property

---

[10]Debtor testified as to a recent sale of another home in her neighborhood, which she contended was in poorer condition than hers. She attempted to testify as to its value, but that testimony was excluded upon objection. Debtor could not independently testify as to the value of the property because she is not qualified as an expert on real estate values. Her information as to the sale price of the property was based upon hearsay sources and was excluded for that reason. Debtor also introduced pictures of new homes being constructed in her neighborhood, but could offer no admissible evidence as to their value.

is not conclusive. There must be a reasonable possibility that the Debtor can effectively reorganize. *In re Anderson*, 913 F.2d 530, 532 (8th Cir. 1990) (must be a "reasonable probability that the debtor will be able to propose a plan for a successful reorganization within a reasonable time."); *see also, In re Bowman*, 253 B.R. 233, 238 (B.A.P. 8th Cir. 2000) (must show proposed plan is feasible and likely confirmable; effective reorganization contemplates feasibility of actual performance of provisions of plan); 2 *Norton Bankruptcy Law and Practice 2d*, § 36:35, p. 36-97 (2d ed. 1997). It is not clear whether Debtor would continue in a Chapter 13 proceeding if the motion is denied and her brother and his investor pay Bennett's claim, whether she has a reasonable prospect of confirming and completing a Chapter 13 plan or what the value of that reorganization would be to creditors. Debtor clearly filed in another attempt to save her house from foreclosure. With that problem solved, and a friendly creditor holding the debt on her residence, she might not need relief under Chapter 13. She has no other secured creditors. Her plan proposes to pay 0% to unsecured creditors. If Debtor would attempt to remain in Chapter 13, there is serious doubt as to whether she could effectively reorganize. Lacking employment or any other reliable source of regular income, Debtor is probably not even eligible for Chapter 13 relief. *See In re Bottelberghe*, 253 B.R. 256, 260 (Bankr. D. Minn. 2000) (nontraditional sources of debtor support fail Chapter 13 regular income test where gratuitous, unreliable or lacking evidence of the requisite stability and regularity); *see also, In re Jordan*, 226 B.R. 117, 119 (Bankr. D. Mont. 1998) (gratuitous payments to debtor from family members do not constitute regular income unless joint liability for debt exists, legal obligation to contribute to support of debtor or direct evidence of assent of third party to assume responsibility for payments to debtor); *see also, In re Hanlin*, 211 B.R. 147, 148 (Bankr. W.D.N.Y. 1997) (debtor whose source of income is how much parents will gift him is not person with regular income). Even if eligible, given the Debtor's

performance in her two previous Chapter 13 cases under similar conditions, the Court would be justified in finding that there is little likelihood that Debtor can make the payments proposed by the plan. She has given this Court no reason to believe that her "family contributions" are any more likely to be made in this third filing than they were in the previous two cases.

### 5. Whether The Motion Would Have Been Granted If Made Before The Sale

For the reasons articulated above, the Court would likely have granted the request for relief had it been presented before the conduct of the foreclosure sale. The same considerations relating to Debtor's lack of good faith and doubts about her intention to or ability to reorganize would have impelled the Court to grant the requested relief. If the motion had been presented to the Court prior to the foreclosure sale, there would not have been intervening rights of the third-party purchaser to consider. While that is a factor in the Court's decision, as discussed below, it is not determinative. Its absence would not necessarily have yielded a different result.

### 6. Prejudice To And Detrimental Reliance Of Movant

As the court observed in *Williams*, the failure to grant the requested retroactive relief would cause expense to Bennett and detrimentally affect her rights. In addition to having incurred expenses in connection with the foreclosure sale, if the sale is not validated, Bennett might be exposed to claims by the purchaser at the foreclosure sale. *Williams*, 257 B.R. at 304. Bennett relied on the absence of a filing in conducting the sale, incurring the associated expenses and executing and delivering a deed to the property to the successful bidder which has since been recorded.

### 7. Movant's Prompt Action In Seeking Stay Relief

While it was Bennett's affirmative act of conducting the sale that resulted in the violation of the stay, that act was taken without notice or knowledge of the filing of any kind. Another factor

weighing in favor of granting an annulment of the automatic stay is Bennett's good faith in promptly seeking relief upon learning of the filing. This case was filed on February 10, 2004. According to all the evidence, Bennett did not become aware of the filing until February 17, when she received notice of the filing from the Bankruptcy Noticing Center. The motion to annul the stay and validate the sale was filed just six days thereafter, on February 23, along with a request for an expedited hearing.

### 8. Intervening Rights Of Third Party Purchaser

In addition to these considerations, the intervention of the rights of an innocent third party also warrants the granting of the requested retroactive relief. There is no dispute that HG Equities had no knowledge of the filing of the case prior to purchasing at the sale. At that time, HG Equities tendered cashier's checks in payment of the purchase price.[11] Debtor contends that while

---

[11]Debtor contends that HG Equities knew of the filing of the bankruptcy before it recorded its deed on February 12, 2004. Debtor testified at the hearing that on February 11, the day between the foreclosure sale and the recording of the trustee's deed, a representative of HG Equities appeared at her door wanting to inspect the property and advising her that the company had purchased the property at the foreclosure sale the day before. Debtor advised that person that she had filed bankruptcy before the sale, which she understood invalidated the sale, and exhibited a copy of her petition. Debtor further testified that her visitor then used her phone to call another representative of the company named "Jerry" to pass on the information given her by Debtor. Debtor testified that the HG Equities representative left her with a business card.

The HG Equities representative appearing at the hearing testified, however, that HG Equities has only two employees and that neither of them visited Debtor's residence on February 11. Debtor was unable to recall the name of the person she claims went to her home on that date and did not produce the business card. Moreover, while Debtor testified that the business card had a pitcutre on it, she didn't identify the HG Equities representative who testified at the hearing (the only female employee of HG Equities, according to the testimony) as the person who appeared at her door. While a meeting between Debtor and a representative of HG Equities may have occurred, the Court thinks it unlikely that it occurred on February 11, 2004 as Debtor testified. The uncontroverted evidence is to the effect that creditor first learned of the filing of the bankruptcy on February 17 after receiving a mailed notice. If HG Equities had learned on February 11 that Debtor had filed a bankruptcy proceeding on the same day as the foreclosure sale, casting doubt on its legitimacy, certainly one of its representatives would have contacted Bennett

14

she will lose her residence if the motion is granted, no party will be harmed by denial of the motion because her brother and his investor plan to make Bennett whole. The Court rejects that contention for several reasons. First, it overlooks the fact that HG Equities, which purchased the property in good faith and without knowledge of the bankruptcy filing, will lose the benefit of its bargain. In another case, that factor might not weigh well against Debtor's loss of her residence. In this instance, however, Debtor has had more than ample opportunity to save her residence and could and probably should have enlisted the support of her brother long ago. Even as of the date of the hearing, Debtor had made no specific proposal to Bennett or HG Equities. Neither Debtor's brother nor his investor appeared at the hearing and no evidence was presented to demonstrate they have the financial capability to pay what is required to immediately satisfy the full balance of the note. Debtor has simply frustrated the legitimate efforts of Bennett to receive payment on the note for too long and acted in such questionable good faith with respect to her and the Bankruptcy Court for this Court to permit Debtor to undo the foreclosure sale at this stage.

Debtor relies on a number of other reported decisions in this district in urging the Court to deny the motion. The Court, however, finds each of those decisions is distinguishable in some significant way.[12] In *Adams*, the lender bid in at the sale. There was, therefore, no third party

---

or her counsel immediately and Bennett would have learned of the filing in that way. The Court also considers it likely that the motion to annul the stay and validate the foreclosure sale would have been filed earlier than February 23 if the purchaser at the sale had learned of the bankruptcy filing as early as February 11. Ultimately, the Court does not believe it matters, since the recording of the deed is merely a ministerial act. The purchaser had made its offer and tendered the purchase price at the sale and was therefore entitled to the deed. *See In re Tucker*, 290 B.R. 134 (Bankr. E.D. Mo. 2003).

[12]Because the court makes no holding on the claim that HG Equities is entitled to the protection of § 549(c), it is not necessary to discuss the holdings in *In re Major*, 218 B.R. 501 (Bankr. W.D. Mo. 1998) and *In re Carpio*, 213 B.R. 744 (Bankr. W.D. Mo. 1997), cited by Debtor for the proposition that the purchaser is not entitled to that protection in this instance.

15

involved in that case whose rights would be detrimentally affected by the failure to grant relief from stay. In *Smith*, the property was also purchased by a lienholder. Moreover, the court in that case denied the motion in part because, by the time the motion was filed and heard, the debtor had already confirmed a Chapter 13 plan and was current on his payments. By contrast in this case, the Chapter 13 trustee has already filed a motion to deny confirmation of the proposed Chapter 13 plan. Most importantly, however, none of the cases cited by Debtor involve the pattern of previous filing, disregard for the obligation to file accurate schedules and statements and other conduct evincing a lack of good faith which are present in this case.

## C. Applicability Of § 549(c)

Because the Court finds that Movant has established cause for granting an annulment of the automatic stay pursuant to § 362(d), the Court makes no ruling on Movant's alternative justification for granting the requested relief, that the purchaser at the foreclosure sale qualifies for the protection provided by § 549(c). The Court notes that while there are previous reported decisions in this district which hold or assume that § 549(c) constitutes a limited exception to the automatic stay,[13] there is a considerable current difference of opinion among the courts on the question. *See Ford v. A.C. Lofton (In re Ford)*, 296 B.R. 537, 544 (Bankr. N.D. Ga. 2003) (see cases collected and cited in footnotes 8 and 10). In arguing that HG Equities is entitled to the protection of § 549(c), Movant also alleges that the "present fair equivalent value" required by that provision is satisfied as a matter of law by the consideration paid at a foreclosure sale conducted in accordance with the requirements of state law. Once again, the Court declines to rule on that

---

[13]*See In re Major*, 218 B.R. 501 (Bankr. W.D. Mo. 1998); *In re Fulmer-Vaught*, 218 B.R. 56 (Bankr. W.D. Mo. 1998); *In re Carpio*, 213 B.R. 744 (Bankr. W.D. Mo. 1997).

16

question, but notes that this issue has also generated a difference of opinion among the courts.[14]

### III. CONCLUSION AND ORDER

For the reasons discussed above, the Court concludes that Movant has established "cause" for granting her motion for an order annulling the automatic stay as regards the foreclosure sale conducted on February 10, 2004 and validating the sale, including the execution, delivery and recording of the trustee's deed to HG Equities, L.L.C.

It is therefore

ORDERED that the Motion to Annul Automatic Stay and to Ratify Trustee's Deed Under Foreclosure be and is hereby granted.

/s/ Dennis R. Dow
Bankruptcy Judge

Date: April 13, 2004.

Copies electronically mailed to:
Richard W. Shankland ** directed to serve parties of interest **
Gwendolyn M. Garcia
Richard V. Fink
J. Brand Eskew
Sallie A. Blackman

---

[14]Some courts, relying in part upon the United States Supreme Court's decision in *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) have held that the consideration paid at a regularly conducted foreclosure sale establishes "present fair equivalent value" as a matter of law. *See TF Stone Company v. Harper (In re TF Stone Company)*, 72 F.3d 466 (5th Cir. 1995); *In re McDonald*, 210 B.R. 648 (Bankr. S.D. Fla. 1997); *Little v. Bago (In re Bago)*, 149 B.R. 610 (Bankr. C.D. Cal. 1993). In *Fulmer-Vaught*, Judge Koger seems to have taken the same position. That holding, however, appears to be an alternative one in a case in which the facts reflected a spirited bidding contest which resulted in the final purchase price being a significant increment above the initial bid. *Fulmer-Vaught*, 218 B.R. at 58. For a list of those cases holding that the price bid at a foreclosure sale does not constitute "present fair equivalent value" for purposes of § 549(c), *see Ford*, 296 B.R. at 537, n. 28.